IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF OHIO

**IN THE MATTER OF THE SEARCH OF SIX (6) ELECTRONIC STORAGE DEVICES FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT 8370 DOW CIRCLE, STE. 200, STRONGSVILLE, OHIO**

Case No. 1:16 MJ 9282

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Timothy R. Stark, Special Agent (S/A) of the U.S. Homeland Security Investigations (HSI) Cleveland, Ohio, hereinafter referred to as "Your Affiant," being first duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      Your Affiant is currently employed as a Special Agent (S/A) with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), authorized to conduct investigations on behalf of DHS ICE HSI and have been so employed since March 2008.  I am currently assigned to the HSI Cleveland, Ohio Office.  I have participated in investigations targeting individuals and

Page **1** of **25**

organizations involved in drug trafficking offenses in the Northern District of Ohio and elsewhere.

3.      Your Affiant is an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  The Affiant is also empowered under Title 19, United States Code, Section 1589a to serve any warrant under the authority of the United States and make warrantless felony arrests for any crime against the United States.  The Affiant is a Customs Officer as defined by Title 19 of the United States Code, and is authorized to conduct warrantless searches at the United States Border or the Functional Equivalent of the United States Border.

4.      Your Affiant has received specialized training at the Federal Law Enforcement Training Facility, located in Glynco, Georgia, in regards to the identification of narcotic substances and the operation of drug trafficking organizations. As part of my training, I have received specialized instruction about narcotics, narcotics trafficking, money laundering and various techniques for investigating persons and organizations engaged in this unlawful conduct. Your Affiant has participated on search warrants and has executed search warrants which have resulted in the seizure of illegal drugs and evidence of drug violations.

5.      Your Affiant has also received specialized training in whereas he has become familiar with the Internet (also commonly known as the World Wide Web), which is a global

network of computers[1] and other electronic devices, to include cellular telephones and/or "smart phones", that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including satellite.  Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state.   Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").

6.       Your Affiant is aware that persons engaged in drug trafficking conceal in their electronic devices, including, but not limited to, cellular telephones, the contact information of drug suppliers, customers and/or couriers including addresses, telephone and pager numbers, records relating to drug and financial transactions, and that sometimes these records are in code.

7.       Your Affiant is aware that individuals involved in narcotics trafficking often utilize cellular telephones, tablet computers and other electronic devices with video/photographic capabilities to record various aspects of their lives, including their drug trafficking activities. Your Affiant also knows that drug traffickers often depend upon electronic communication devices to maintain extensive contacts throughout the country.  These communications systems

---

[1]  The term "computer" is defined by 18 U.S.C. § 1030(e)(1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

expedite the transportation of drugs from the main source of supply, through the drug distribution network and eventually to the end drug user.  To do this, continued access to electronic communication devices is essential to maintaining long distance and local contacts. Electronic communications are essential to drug traffickers due to the vast distances involved in moving narcotics and coordinating the delivery of those narcotics to couriers and, ultimately, street-level drug dealers.  Your Affiant has personally seized electronic communication devices from drug traffickers in the past.  Information from these devices has provided valuable information regarding suspected criminal associates that has assisted several criminal investigations, including the phone number of the particular device, incoming and outgoing call data, dates and times of phone calls, address book information (names and associated phone numbers), records and content of incoming and outgoing text and/or multimedia messages, and missed, received and dialed calls.  Cell phones can also store internet and GPS location information indicating areas to which the individual using the phone has traveled, internet searches performed as well as web pages visited.  Information and data that is stored on these electronic devices can remain stored on the device indefinitely.

8.    This Affidavit is submitted in support of a search warrant authorizing the search of six (6) cellular telephones found during the execution of search warrants associated with KRISTOPHER COURTNEY and found during the arrest of COURTNEY after a stop of his vehicle.  Based on your Affiant's training and experience and my knowledge of this investigation, I believe these communication devices were used by COURTNEY to conduct drug trafficking activity and that evidence of drug trafficking will be found on these devices.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

9.      The property to be searched is:

   a.   A Samsung tablet computer bearing serial number RF2F808JMOH;

   b.   A LG cellular telephone bearing serial number 404CYDG0068586;

   c.   A Samsung cellular telephone bearing serial number A000000CDA170C;

   d.   A Samsung cellular telephone bearing serial number A00000FACECD1;

   e.   A BLU cellular telephone bearing serial number 1120018015012403;

   f.   A Samsung cellular telephone bearing serial number A00000456FBA07.

These items are collectively referred to as "the Devices."  The Devices are currently

located at 8370 Dow Circle, Ste. 200, Strongsville, Ohio.

10.     The applied-for warrant would authorize the forensic examination of the Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

11.     On August 15, 2016, Detective Robert McKay, Cleveland Police Department, was

contacted by a Confidential Reliable Informant (CRI) who stated he/she had information on a

male who was selling heroin in the amounts of 100 and 200 grams at a time.  After receiving the

information, Detective McKay made arrangements with your Affiant and special agent Salloum

of Homeland Security Investigations (HSI) to meet up with the CRI.  The CRI stated he/she was

contacted by a male who was attempting to put together a team to rob KRISTOPHER COURTNEY.  COURTNEY was reportedly selling large amounts of heroin at the address of 2973 E. 130th St., Cleveland, Ohio, and leaving every night around midnight with $20,000 to $50,000 in United States currency.

12.     On August 15, 2016, the CRI took Detective McKay, your Affiant, and SA Salloum to 2973 E. 130th Street and showed them the house where the narcotics were being sold. The CRI stated that COURTNEY did not live at this address but sold his drugs there.  The CRI stated that COURTNEY would buy a house, move his sister in, use the house for a short time for his drug trafficking, and then move to another house he would purchase as he would continually move his drug operation.  The CRI stated COURTNEY arrived between 10:00 a.m. and 12:00 p.m. each morning, bringing narcotics with him.  COURTNEY would leave between 9:00 p.m. to 12:00 a.m. each night with all his pants pockets full of currency derived from selling controlled substances.  Later that day, the CRI accompanied agents to the residence at 2973 E. 130th Street and identified a 2008 Chevrolet Silverado, Ohio License plate PJH-8273, which was parked on the street in front of the house.  The CRI stated that the 2008 Chevrolet Silverado was the vehicle consistently driven by COURTNEY.  The CRI also identified and described a black male wearing a white t-shirt and white baseball cap standing in front of the doorway of 2973 E. 130th Street (rear) as COURTNEY.

13.     Detective McKay conducted queries utilizing law enforcement computer systems and the Cuyahoga County database and learned that the Chevy Silverado was registered to "K County Management, LLC" with an associated social security number (SSN) assigned to KRISTOPHER COURTNEY.  Ohio Law Enforcement Gateway (OHLEG) photographs

confirmed that COURTNEY was the same male that the CRI pointed out.  Detective McKay

then conducted a search through the Ohio Secretary of State's website and found that the

agent/registrant information listed KRISTOPHER COURTNEY as the agent for the company

and was signed on 12/2/2010 by KRISTOPHER COURTNEY.  HSI agents then conducted a

search into the possible buying of houses by COURTNEY as stated by the CRI and found an

additional twenty-six (26) properties associated with COURTNEY and/or family members with

an aggregate value of $388,773.

  14.  Agents conducted a review of criminal history records and discovered the

following criminal convictions for KRISTOPHER COURTNEY:

| Date of Arrest | Charge | Severity | Disposition |
|---|---|---|---|
| December 15, 1995 | O.R.C 2911.02 Robbery | Felony in the 2nd degree | Convicted |
| October 07, 1996 | ORC 2923.12 CCW | Felony in the 3rd degree | Convicted |
| July 21, 1999 | ORC 2925.11 Possession of Drugs | Felony in the 2nd degree | Convicted |
| January 12, 2000 | ORC 2925.11 Attempted Possession of Drugs | Felony in the 3rd degree | Convicted |
| February 3, 2000 | ORC 2925.11 Possession of Drugs | Felony in the 3rd degree | Convicted |
| May 29, 2007 | ORC 2925.11 Trafficking in Drugs | Felony in the Fourth degree | Convicted |

COURTNEY has six (6) convictions which are felonies and punishable by imprisonment for a

term exceeding one (1) year.

  15.  After confirming this information, members of HSI and the Cleveland Police

Department began conducting surveillance of KRISTOPHER COURTNEY on August 17, 2016.

During our surveillance, HSI Special Agents and Cleveland Police Officers observed individuals

coming to the address of 2973 E. 130th Street and be let in the premises by COURTNEY through the eastern most door on the north side of the house. The individuals would stay a short time then leave the area consistent with drug trafficking. On at least one occasion, COURTNEY met an individual in the back parking lot of the address and conducted a hand to hand transaction. Agents also followed COURTNEY to numerous addresses where individuals would walk up to his Chevy Silverado and conduct hand-to-hand transactions or COURTNEY would exit the truck and meet an individual in a driveway where he would conduct a hand to hand transaction. During these incidents, he would leave 2973 E. 130th Street, meet an individual to conduct a hand-to-hand transaction and return immediately to 2973 E. 130th Street.

16.     Over the next couple days, law enforcement officers continued periodic surveillance with the same activity continuing. Agents attempted several times to follow KRISTOPHER COURTNEY home after his daily sales. Upon completion of his daily sales activity, COURTNEY would leave the E. 130th Street address for the night. He became extremely evasive during surveillance in an attempt to be certain he was not followed as he employed tactics known to your affiant as 'counter surveillance'. These tactics included driving on the same block then stopping to watch vehicles going by, driving all back roads, and avoiding the main streets to make sure he was not being followed. On numerous occasions, agents lost COURTNEY attempting to follow him home. At this point, agents sought to obtain a GPS warrant for COURTNEY's Chevy Silverado.

17.     On August 18, 2016, Detective McKay obtained a GPS warrant for the 2008 Chevy Silverado, Ohio License PJH-8273, with Vin #2GCEC130681227983. The warrant was signed by Cuyahoga Common Pleas Court Judge Robert McClelland.

18.     The GPS device was installed on the vehicle on August 25, 2016, at 12:56 a.m. During the time the GPS was installed, agents continued periodic surveillance to verify the locations where KRISTOPHER COURTNEY was stopping.  During this time period, COURTNEY developed a pattern of going to the address of 2973 E. 130th Street, Cleveland, Ohio every day and staying at this location from 12:00 p.m. to 12:00 a.m.  COURTNEY also spent the night at different houses most frequently at 13695 Shady Oak, Garfield Heights, Ohio. Also, during the weekend of August 27th and 28th, COURTNEY stayed at 3532 Normandy Road, Shaker Heights, Ohio.

19.     Through the investigation, agents learned that a female named Catrina M. Williams owned and lived at the address of 13695 Shady Oak Blvd., Garfield Hts., Ohio.  This female also had a past address of 20608 Watson, Maple Hts., Ohio which is owned by COURTNEY.  Agents also learned through the investigation that a female by the name of Charnise N. Harris lived in the upstairs unit with two (2) juveniles at 3525 Normandy Road, Shaker Hts., Ohio.  Agents discovered that one of the juveniles residing at the residence was a two year-old with the last name of COURTNEY.  A trash pull was done by your Affiant on September 1, 2016, at the 3525 Normandy address which produced a piece of mail in the name of KRISTOPHER COURTNEY.

20.     On September 1, 2016, Detective McKay sought to obtain search warrants for 2973 E. 130th Street, up rear, 13695 Shady Oaks Blvd., and a document search warrant for 3532 Normandy Road.  These warrants were signed by Cuyahoga Common Pleas Court Judge Brian Corrigan.

21.     On September 2, 2016, at approximately 3:04 p.m., law enforcement officers conducted an investigative stop on KRISTOPHER COURTNEY as he left a house in the area of W. 100th Street, Cleveland, Ohio.  Simultaneously, agents executed search warrants at the above addresses.  Upon making entry into the E. 130th Street address, agents observed packaging material and drugs in plain view.  Detective McKay immediately called Sergeant Petranek, who was conducting the investigative stop of COURTNEY with a marked Cleveland Police vehicle and told him to place COURTNEY under arrest.  COURTNEY was then brought to the address of E. 130th Street while Cleveland Police Officer Walter towed COURTNEY's 2008 Chevy Silverado.  Prior to the vehicle being towed, a Cuyahoga County Sheriff K-9 walked around the vehicle and alerted on the passenger door.  The K-9 checked the inside of the vehicle, and alerted on the driver side dashboard.  The vehicle was then towed to a Cleveland Police impound lot until a search warrant could be obtained for the vehicle.

22.     During the search warrant execution of 3532 Normandy Road, officers located and seized items including but not limited to the following:

| Description | Location |
| --- | --- |
| .38 caliber Derringer firearm | Master bedroom |
| Mail addressed to COURTNEY | Rear screen porch |
| First Merit bank statement | Dining room |

23.     During the search warrant execution of 13695 Shady Oak, officers located and seized items including but not limited to the following:

| Description | Location |
| --- | --- |
| Real estate documents | Basement |
| Shoe box with packaging materials and residue | Upstairs bedroom |
| Kilo press and carrying case | Upstairs bedroom |

| | |
|---|---|
| Vacuum sealer and bags | Upstairs bedroom |
| Bulk keys | Upstairs bedroom and living room entertainment center |
| Plastic bags and gloves with residue | Basement |
| Digital scale | Basement |
| **Samsung tablet computer S/N RF2F808JMOH** | **Upstairs bedroom** |

24.     During the search warrant execution of 2973 E. 130th Street, officers located and

seized items including but not limited to the following:

| Description | Location |
|---|---|
| Bag of suspected cocaine | Attic |
| Mossberg 20 gauge shotgun with (3) live rounds of ammunition (manufactured outside the State of Ohio) | Basement |
| Three (3) bags of suspected heroin | Basement |
| Glove with suspected cocaine | Bedroom |
| Two (2) bags of suspected cocaine | Dining room |
| Six (6) bags of suspected heroin | Dining room |
| Two (2) bags of suspected marijuana | Dining room |
| Hi-Point rifle with five (5) live rounds of ammunition | Dining room |
| Judgment entry paperwork | Dining room |
| **LG cellular telephone S/N 404CYDG0068586** | **Dining room** |
| Mail | Dining room |
| Notebook | Dining room |
| **Samsung cellular telephone S/N A000000CDA170C** | **Dining room** |
| Suspected marijuana | Dining room |
| Two (2) Hi-Point rifle magazines | Dining room |
| Four (4) digital scales, two (2) with residue | Dining room |
| $150.00 United States currency | Inside vehicle |
| Bag of pills | Kitchen |
| Bag of suspected heroin | Kitchen |
| $668 United States currency | On COURTNEY's person |

25.     During the arrest of KRISTOPHER COURTNEY, officers located and seized

items including but not limited to the following:

| Description |
| --- |
| **Samsung cellular telephone S/N A00000FACECD1** |
| **BLU cellular telephone S/N 1120018015012403** |
| **Samsung cellular telephone S/N A00000456FBA07** |

26.     During the search warrant, Detective McKay interviewed KRISTOPHER
COURTNEY and advised him of his constitutional rights, which he stated that he understood.
Detective McKay asked him where the keys were to the E. 130th Street residence.  COURTNEY
became evasive and stated he did not have them with him now.  COURTNEY later stated the
keys for both the up and down units were in his truck when he was arrested. On September 12,
2016, agents received the results from the Cuyahoga County Crime lab in reference to the drugs
seized from 2973 E. 130th Street, Cleveland, Ohio.  Agents seized 58.39 grams of heroin, 196.41
grams of a mixture containing heroin/fentanyl, and 140.12 grams of cocaine.

27.     On September 2, 2015, COURTNEY was arrested by based on the investigation
above.  On September 12, 2016, U.S. Magistrate Judge Jonathan D. Greenberg signed a criminal
complaint, Case No. 16-MJ-04113 and arrest warrant for COURTNEY.  On September 13, 2016,
COURTNEY appeared before Magistrate Judge Greenberg and was detained.  On September 28,
2016, COURTNEY was indicted by a federal grand jury in Case No 1:16CR309.  The matter is
currently pending before the Honorable James S. Gwin.  COURTNEY is currently in the custody
of the U.S. Marshals within the Northern District of Ohio.

28.     Based on the foregoing facts and circumstances, your Affiant believes that there is
probable cause to believe that KRISTOPHER COURTNEY has committed the offense of
possession with the intent to distribute and the distribution of controlled substances, in violation

of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and being a felon in possession

of a firearm in violation Title 18, United States Code, Section 922(g)(1), and that further

evidence of COURTNEY'S commission of these offenses will be found through the forensic

examination of these Devices.

      29.     The Devices are currently in storage at 8370 DOW CIRCLE, STE. 200,

STRONGSVILLE, OHIO.  In my training and experience, I know that the Devices have been

stored in a manner in which the contents are, to the extent material to this investigation, in

substantially the same state as they were when the Devices first came into the possession of the

HSI Cleveland.

**TECHNICAL TERMS**

      30.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

      a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication through radio

signals.  These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones.  A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of

calls made to and from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing names and

phone numbers in electronic "address books;" sending, receiving, and storing text messages and

e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on personal

calendars; and accessing and downloading information from the Internet.  Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of

the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and

removable storage media to store their recorded images.  Images can usually be retrieved by

connecting the camera to a computer or by connecting the removable storage medium to a

separate reader.  Removable storage media include various types of flash memory cards or

miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to photographs or

videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video, or

photographic files.  However, a portable media player can also store other digital data.  Some

portable media players can use removable storage media.  Removable storage media include

various types of flash memory cards or miniature hard drives.  This removable storage media can

also store any digital data.  Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional features such as a

calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.zteusa.com, I know that the Devices have capabilities that allow it to serve as **a** wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

33.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools.  This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten.  In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it.  To give a few examples, this forensic evidence

can take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

34.     Forensic evidence.  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

> e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

> f.      I know that when an individual uses an electronic device to [[obtain unauthorized access to a victim electronic device over the Internet]], the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

> 35.      Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.     Manner of execution.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

<u>CONCLUSION</u>

37.     Your Affiant believes that, based upon the facts detailed in this Affidavit, there is probable cause to believe that located in the devices described herein, there are fruits, evidence, and instrumentalities of criminal offenses against the United States; namely:

    a.     Title 21, U.S.C., Section 841(a)(1) - that is, knowingly and intentionally distributing controlled substances and/or knowingly and intentionally possessing controlled substances with intent to distribute.

    b.     Title 18, U.S.C., Section 922 (g) - that is, felon in possession of a firearm.

38.     Special Agent Timothy R. Stark, HSI, being duly sworn according to law, depose, and say that the facts stated in the foregoing Affidavit are true and correct to the best of his knowledge, information, and belief and I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

1:16 MJ 9282

Respectfully submitted,

Timothy R. Stark
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on November 15, 2016:

WILLIAM H. BAUGHMAN, JR.
UNITED STATES MAGISTRATE JUDGE